BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (149343)
600 B Street, Suite 1550
San Diego, CA 92101
Telephone: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

BONNETT, FAIRBOURN, FRIEDMAN
 & BALINT, P.C.
ANDREW S. FRIEDMAN (AZ 005425)
ELAINE A. RYAN (AZ 012870)
PATRICIA N. SYVERSON
 (CA 203111; AZ 020191)
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012-3311
Telephone: 602/274-1100
602/274-1199 (fax)
afriedman@bffb.com
eryan@bffb.com
psyverson@bffb.com

PISCITELLI LAW FIRM
FRANK E. PISCITELLI, JR.
55 Public Square, Suite 1950
Cleveland, OH 44113
Telephone: 216/931-7000
frank@piscitellilaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRY DENNIS and JON KOZ, On Behalf of Themselves and All Other Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>KELLOGG COMPANY, a Delaware Corporation,<br><br>Defendant. | Case No.: 3:09-CV-01786-IEG(WMC)<br><br>CLASS ACTION<br><br>DECLARATION OF TIMOTHY G. BLOOD IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT<br><br>Date: February 14, 2011<br>Time: 10:30 a.m.<br><br>Courtroom: 1, 4th Floor<br>Judge: Honorable Irma E. Gonzalez<br>Date Filed: August 17, 2009<br>Trial Date: TBD |

I, TIMOTHY G. BLOOD, hereby declare as follows:

1. I am the managing partner of the law firm of Blood Hurst & O'Reardon, LLP ("BHO"). I am submitting this declaration in support of plaintiffs' motion for final approval of the class action settlement on the terms and conditions reflected in the Stipulation of Settlement ("Stipulation")[1] filed with this court on September 10, 2010. The facts set forth in this declaration are stated of my own personal knowledge and on information and belief based on my day-to-day involvement with this litigation from its inception to the present.

2. In or about March or April, 2009,[2] I, along with lawyers from the Piscitelli Law Firm and Climaco, Wilcox, Peca, Tarrantino & Garofoli Co., L.P.A., began investigating the marketing claims concerning Mini-Wheats made by defendant Kellogg Company, including whether there was any scientific substantiation to support Kellogg's claims. Our efforts included obtaining advertisements (including labeling) from a variety of sources and throughout the country, performing medical research into the claims and related areas, sending a Freedom of Information Act ("FOIA") request to the U.S. Federal Trade Commission ("FTC") and reviewing and analyzing the information collected.

3. In late April and early May 2009, we drafted a class-action complaint.

4. On May 5, 2009, on behalf of Mr. Koz, we sent a pre-suit demand letter to Kellogg along with the proposed complaint, which alleged violations of Ohio's Consumer Sales Practice Act (Ohio Rev. Code §1345, *et. seq.*), Ohio's Deceptive Trade Practices Act, (Ohio Rev. Code §4165, *et. seq.*) and breach of warranty.

5. Meanwhile, and separate from the work being performed by my group and me, I understand that a separate analysis of the claims and factual investigation was being performed by the law firm of Bonnett, Fairbourn, Freidman & Balint, P.C., on behalf of their client, Harry Dennis.

---

[1] All capitalized terms herein have the same meaning as set forth in the Stipulation.

[2] When I began researching this case, I was a partner at the law firm of what is now called Robbins Geller Rudman & Dowd, LLP. In January 2010, I and others from the Robbins Geller firm left to form our own firm, Blood Hurst & O'Reardon, LLP.

6. On August 17, 2009, Mr. Dennis filed a complaint against Kellogg in this District Court.

7. Meanwhile, I understand that the law firm of Whatley, Drake & Kallas, LLC was also conducting their own investigation and analysis of Kellogg's alleged conduct.

8. After receiving Mr. Koz's May 5, 2009 demand letter, Kellogg contacted my co-counsel, Frank Piscitelli, to discuss the possibility of a resolution. Kellogg subsequently contacted the other plaintiffs' counsel as well. In late May 2009, we agreed to not file the complaint sent to Kellogg earlier that month, based on Kellogg's request that we not do so, and its cooperation in informally exchanging information and a stated willingness to discuss settlement.

9. Ultimately, once all of the plaintiffs' counsel learned of each others' involvement in this matter, we decided that joining forces and working together would best advance the cases on behalf of our clients and the proposed classes. Collectively, we continued to obtain additional information about the matter and pursue settlement discussions with Kellogg.

10. During this process, we demanded and received additional information and data (including sales data) from Kellogg and, after analyzing this additional information, engaged in several months of informal attempts to resolve the claims at issue.

11. Ultimately, the Parties' informal attempts to settle the matter were not successful and therefore the Parties agreed to attend mediation.

12. On January 13, 2010, the Parties participated in a full day, fully briefed mediation session with Martin Quinn, Esq. of JAMS in San Francisco. Both leading up to the mediation and afterwards, the Parties held numerous settlement negotiation conference calls. From the outset of the negotiating process, the Parties agreed to refrain from discussing the issue of attorneys' fees and expenses until all material terms of a settlement were finalized.

13. By February 2010, the Parties' negotiations moved beyond constructing a framework for settlement and to the point of proposing specific substantive settlement terms. Over the next three to four months, the Parties continued settlement discussions in earnest,

negotiating the specific terms of the agreement, the release, the notice program, the claims submission process, the product donations, and the accompanying exhibits. These additional negotiations ultimately resulted in the Stipulation of Settlement, along with its accompanying exhibits. I was the attorney primarily involved in and responsible for the settlement negotiations and drafting and negotiation of the settlement documents.

14. The background and qualifications of BHO are detailed in the firm's resume attached as Exhibit 1.

15. The parties have entered into a Settlement that provides $2.75 million of monetary relief for Class members who purchased Kellogg's Frosted Mini-Wheats that will revert to *cy pres* to the extent not claimed by Class members. Class members need only fill out a very simple claim form to recover up to $15, the equivalent of three boxes of cereal. Further, Class members need not recall the price they paid, it is presumed to be $5 per box (which is about $1 more than the 16.3 ounce box, and roughly the same price as the 24 ounce box). In addition, there will be a separate substantial *cy pres* charitable food donation comprised of a variety of Kellogg's healthier food products, with a value of $5.5 million. The Settlement was specifically designed to include the sizable food donations in recognition of the difficulties and cost inherent in identifying and notifying purchasers who bought from retailers up to three years ago. In other words, this is a prototypical *cy pres* situation and plaintiffs structured the Settlement accordingly.

16. Additionally, the Settlement includes substantial non-monetary benefits by way of removing any assertion to the effect that eating a bowl of Kellogg's Frosted Min-Wheats cereal is clinically shown to improve attentiveness by nearly 20%. To the extent that Kellogg makes claims on the impact of attentiveness from eating Frosted Mini-Wheats, it will limit and qualify such claims wherever made with "Clinical studies have shown that kids who eat a filling breakfast like Frosted Mini-Wheats have an 11% better attentiveness in school than kids who skip breakfast," or words to the same effect. In the event Kellogg makes claims about the impact on memory or other cognitive function from eating Frosted Mini-Wheats, Kellogg will similarly limit and qualify such claims. The Settlement was obtained after both sides of

experienced counsel had an understanding of the strengths and weaknesses of their clients' respective claims and defenses and with consideration of the manifest risks of protracted litigation.

17. As part of the Settlement, plaintiffs successfully negotiated a clear, concise Notice of Settlement to the Class and an easy to use Claim Form. The Notice provides information about the case and Settlement, including a number of references to phone numbers and websites for Class members to utilize in case they have questions about the Settlement. The notice program focused on publishing the publication notice in *Parents Magazine* and numerous Internet sites and was targeted to reach consumers of children's cereals because Kellogg does not have mailing addresses for most Class Members. I understand that the notice program has been fully implemented in accordance with the Court's Preliminary Approval Order.

18. The Settlement also provides that Kellogg retain a Claim Administrator (the Parties agreed upon Garden City Group, Inc.) to assist in designing the notice program and to conduct various tasks, including publishing the Class Notice in *Parents Magazine* and Internet sites, arranging for and staffing a toll-free number to answer questions from Class members and others, establishing a website that posts the Class Notice, the Claim Form and other related documents, receiving and maintaining requests for exclusions and claim forms, and otherwise assisting the Parties with administration of the proposed Settlement.

I. **Factors In Support of Settlement**

19. The above description of the settlement negotiations should make clear that this Settlement is the result of arms-length bargaining and was achieved with the assistance of Martin Quinn.

20. Counsel for plaintiffs and Kellogg are seasoned practitioners in the specialized areas of class actions. I have significant experience litigating consumer class actions under the California Consumers Legal Remedies Act (Civil Code §§1750 *et seq.*), and California Business and Professions Code §§17200 *et seq.* In addition, since the early 1990's, I have spent a large portion of my practice litigating class action consumer fraud cases in jurisdictions

throughout the United States. More recently, my practice has included numerous cases concerning deceptive advertising of consumer goods, including food products.

21. On Kellogg's side, its defense was led by Dean N. Panos, a partner at Jenner & Block in Chicago, with extensive experience in class action and business tort defense. The Settlement, negotiated by experienced defense counsel from a well respected firm, who refused to give an inch without first exploring every possible defense and contingency, should be presumed reasonable.

22. In deciding to settle this case, Class Counsel carefully considered the risk and expense of further litigation and the reasonableness of the Settlement benefits in light of the risk. This case presents several challenging issues regarding class certification in a litigated context. If a class was certified, plaintiffs would face the cost and risk of proving their case at trial with expert testimony concerning the scientific basis for the "attentiveness claims," that would no doubt be countered by expert testimony presented by Kellogg. Given these considerations and the ongoing costs associated with continuing this litigation, and in light of the immediate benefits provided to Class members through the Settlement, I believe the Settlement is fair, reasonable, and adequate.

23. Additionally, and most importantly, in concluding that the Settlement is fair and reasonable, Class Counsel considered the benefits obtained for the Class. The Settlement includes direct monetary relief in the form of a $2.75 million claim fund for the benefit of the Class. Any remaining funds in the interest bearing fund established by Kellogg will not revert to Kellogg, but will be paid out through *cy pres* distributions to organizations agreed to by the Parties and approved by the Court. Significantly, the Notice informed Class members that any monies not claimed by the Class would be directed to charities, effectively giving all Class members a choice between making a claim and taking a cash payment for themselves or letting the money be donated to worthy charities. Separate from the claim fund, and in recognition of the fact that the difficulty and expense of locating Class members would rapidly exceed benefits, the Settlement provides for $5.5 million of food donations from Kellogg to charities that distribute to the indigent. The food donations are comprised of a defined group of

Kellogg's healthier products. This substantial donation of food aid to charities serves the general public interest of disgorgement and deterrence as well as the interests of consumers who might not otherwise be reached by a settlement.

24. Just as important, going forward, the Settlement requires Kellogg to change its packaging to eliminate misrepresentations to the effect that Frosted Mini-Wheats improve attentiveness and memory. The overall result of the Settlement is to compensate consumers for past wrongs and protect consumers in the future. I do not believe that the Class could have obtained my superior relief even if the case had been litigated through trial. Given all these considerations, I believe the Settlement is fair, reasonable and adequate and should be approved.

## II. The Factors Supporting the Request for An Award of Attorneys' Fees and Expenses and Plaintiff Incentive Awards

25. As a result of the Settlement negotiations, Kellogg has agreed to pay attorneys' fees and expenses in an amount not to exceed $2 million. Class Counsel took this case on a contingency basis and would receive nothing unless they successfully resolved this lawsuit. Now, after over a year of litigation and Settlement negotiations, plaintiffs have succeeded in obtaining an extremely fair and adequate Settlement. Class Counsel should be compensated for their successful efforts. Further, the award of attorneys' fees and expenses is separate and apart from the relief provided to the Class.

26. From January 2010 through December 17, 2010, the total hours spent by BHO was 221 hours, equating to a total lodestar amount based on the firm's billing rates of $119,270. The hourly rates shown below are the usual and customary rates charged for each individual in all of our cases, including class action cases, and for hourly paying clients. A breakdown of the lodestar is as follows:

| Name | Hours | Rate | Lodestar |
|---|---|---|---|
| Timothy G. Blood | 121.75 | $655 | $ 79,746.25 |
| Leslie E. Hurst | 28.75 | $585 | $ 16,818.75 |
| Thomas J. O'Reardon II | 17.50 | $510 | $  8,925.00 |
| Paralegal | 53.00 | $260 | $ 13,780.00 |
| Total | 221.00 | | $119,270.00 |

27. Through December 17, 2010, BHO incurred a total of $589.70 in expenses in connection with the litigation. The expenses are as follows:

| Expense Category | Total |
|---|---|
| Photocopies | $418.60 |
| Lexis/Pacer | $ 74.62 |
| Postage | $ 10.58 |
| Long Distance Telephone | $ 85.90 |
| **Total** | **$589.70** |

28. The expenses pertaining to this case are reflected in the books and records of BHO. These books and records are prepared from expense vouchers, check records and other documents and are an accurate record of the expense. All of the expenses listed above were reasonably incurred in the normal course of business. It is the practice of BHO to charge our clients for these categories of expenses.

29. As noted above, from the inception of the litigation until January 2010, I and others worked on this case as members and associates of the Robbins Geller firm. From inception of the case through December 31, 2010, the hours, lodestar and expenses of the Robbins Geller firm are set forth below.

| Name | Hours | Rate | Lodestar |
|---|---|---|---|
| Timothy G. Blood | 12.25 | $655 | $ 8,023.75 |
| Thomas J. O'Reardon II | 10.25 | $345 | $ 3,536.25 |
| Paralegal | 1.75 | $280 | $   490.00 |
| Economic Analyst | 1.00 | $295 | $   295.00 |
| Client Relations | 3.00 | $285 | $   855.00 |
| **Total** | **28.25** | | **$13,200.00** |

| Expense Category | Total |
|---|---|
| Photocopies | $   499.52 |
| Lexis, Pacer and Research | $   208.23 |
| Postage | $       0.88 |
| Mediation Fees | $2,875.00 |
| Messenger Services | $     60.00 |
| **Total** | **$3,643.63** |

30. These hours, rates and expenses are reflected in the books and records of Robbins Geller, summaries of which were provided to me for plaintiffs' fee application.

31. The hours, lodestar and expenses of the other plaintiffs' counsel that worked on the case are set forth in the concurrently filed declarations from each such law firm. Based on

these declarations, I am informed that Class Counsel in total spent 944.5 hours litigating this case through mid-December 2010, for a total lodestar of $459,203. Based on these declarations, the total non-reimbursed expenses incurred to date are $16,334.13.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 30th day of December, 2010, at San Diego, California.

                                                   s/ Timothy G. Blood
                                                  TIMOTHY G. BLOOD

EXHIBIT 1



600 B Street, Suite 1550 | San Diego, CA 92101
T | 619.338.1100  F | 619.338.1101
www.bholaw.com

# FIRM RESUME

**BLOOD HURST & O'REARDON | LLP**

Blood Hurst & O'Reardon, LLP specializes in the nationwide prosecution of complex class and representative actions. The firm represents the interests of consumers, insurance policy holders and investors in state and federal trial and appellate courts throughout the country. The principals of Blood Hurst & O'Reardon come from a nationwide firm that was the largest and most prominent in the country representing plaintiffs in class action litigation, where they formed the core of the consumer and insurance practice group. Blood Hurst & O'Reardon's principals have been appointed lead counsel and have held other leadership positions in a wide variety of class action matters.

### Timothy G. Blood

Mr. Blood is the firm's managing partner. His practice has focused on complex litigation, including class action litigation, since the early 1990's. Mr. Blood has tried class action cases and is a recognized expert on consumer fraud law, including California's Unfair Competition Law and Consumers Legal Remedies Act.

Mr. Blood has represented millions of retail consumers, holders of life, automobile and homeowner's insurance policies, mortgagors, credit card customers, homeowners, and victims of race and income discrimination. He practices in both state and federal courts throughout the country, and has represented the interests of consumers formally or informally before the Federal Trade Commission, the California Department of Justice, the California Legislative Analyst's Office and the California Department of Insurance.

In 2010, Mr. Blood has been appointed: (1) Co-Lead Class Counsel by the Los Angeles Superior Court in *In re Toyota Motor Cases*, JCCP No. 4621 (Toyota Unintended Acceleration Consolidated Litigation); (2) Co-Lead Class Counsel by the United States District Court for the Southern District of California in the multidistrict litigation *In re: Hydroxycut Marketing and Sales Practices Litigation*; (3) to the Plaintiffs' Steering Committee by the United States District Court for the Eastern District of Louisiana to lead the multidistrict litigation *In re: Apple iPhone 3G and 3GS "MMS" Marketing and Sales Practices Litigation*; and (4) to the plaintiffs' Executive Committee by the United States District Court for the District of New Jersey to lead the multidistrict litigation *In re: Cheerios Marketing & Sales Practices Litigation*. Mr. Blood also currently acts as lead counsel in the Dannon Activia and DanActive consumer fraud litigations, which consist of a series of class action cases filed in federal courts around the country, which have resulted in a nationwide class action settlement. He was lead trial counsel in *Lebrilla v. Farmers Insurance Group, Inc.*, a multistate class action which settled on terms favorable to the class after a month long trial and just before closing arguments. He was also co-lead trial counsel in *In re Red Light Photo Enforcement Litigation*, an action brought on behalf of California motorists, which is currently pending before the California Supreme Court.

Mr. Blood has represented millions of purchasers of food, food supplements and over-the-counter drugs arising out of various advertising claims made by manufacturers and retailers. He has also represented owners of motor vehicles in product liability cases, and consumer credit and mortgage borrowers against a number of major lending institutions, including Bank of America, Washington Mutual, Countrywide, GMAC and Wells Fargo.

BLOOD HURST & O'REARDON | LLP

    Mr. Blood has extensive experience litigating against life, auto and other insurance carriers on behalf of consumers. His experience litigating against life insurance companies includes representing owners, holders and beneficiaries of industrial life insurance in race discrimination cases (with class periods dating back to the late 1800's). He also represented those holding traditional life insurance policies in market conduct actions such as the "vanishing premium" life insurance actions. Mr. Blood was responsible for one of only two litigated cases where classes where certified in the vanishing premium series of cases. He was also one of the few plaintiffs' attorneys to obtain class-wide recoveries in the "imitation parts" automobile insurance actions. Insurance companies against whom Mr. Blood has litigated include the American General companies, Farmers Insurance Group of Companies, Mercury Insurance Group, Allstate, State Farm, Great Southern Life, Metropolitan Life, United Life Insurance Company, Midland National Life Insurance Company and General American Insurance Company.

    Mr. Blood has also represented consumers in traditional false advertising actions, those victimized by so-called "negative option" sales practices, and owners of a variety of different types of faulty computer equipment and software from manufacturers, including Apple, Dell, and IBM.

    Mr. Blood has been involved in a number of precedent-setting appellate decisions in areas which include consumer and insurance law and class action procedure. These appellate decisions include *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305 (2009) (insurance law); *Lebrilla v. Farmers Group, Inc.*, 119 Cal. App. 4th 1070 (2004) (automobile insurance and class action procedure); *Moore v. Liberty Nat'l Life Ins. Co.*, 365 F.3d 408 (5th Cir. 2004) (life insurance and civil rights); *McKell v. Washington Mutual Bank, Inc.*, 142 Cal. App. 4th 1457 (2006) (banking law and consumer law); *Lavie v. Proctor & Gamble, Inc.*, 105 Cal. App. 4th 496 (2003) (consumer law and false advertising); *Hawaii Medical Ass'n v. Haw. Med. Serv. Ass'n*, 148 P.3d 1179 (Haw. 2006) (health insurance); *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49 (2nd Cir. 2004) (consumer and banking law); and *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384 (3rd Cir. 2005) (consumer and banking law).

    Mr. Blood has testified before the California State Assembly and State Senate Judiciary Committees, as well as the Assembly and Senate Committees on Banking, Finance & Insurance. He has worked at both the state and federal level with lawmakers and government agencies to shape legislation to protect consumer rights, including lobbying on the Class Action Fairness Act of 2005.

    Mr. Blood is a frequent continuing legal education speaker on topics which include complex litigation, class action procedure, financial fraud litigation, insurance litigation and consumer fraud. He has been an invited speaker for American Bar Association practice groups, the Practicing Law Institute, Loyola Law School, American Association of Justice, Consumer Attorneys of California, ALI-ABA, the National Practice Institute and the Consumer Attorneys of San Diego, for which he chairs a multi-day seminar on class action litigation.

    Mr. Blood is frequently consulted by the media. He has appeared on Good Morning America, ABC World News Tonight, and major network affiliates on behalf of his clients. He

**BLOOD HURST & O'REARDON | LLP**

has been interviewed for stories featuring consumer rights issues and his cases in *The New York Times*, *The Wall Street Journal*, *The Los Angeles Times*, the *Daily Journal*, *Adweek* and others.

Mr. Blood serves on the Board of Governors of the Consumer Attorneys of California, and on the Executive Board of the Consumer Attorneys of San Diego. In 2007, he was a finalist for the Consumer Attorneys of California Lawyer of the Year award for his trial work in a multistate class action against Farmers Insurance. He has been named a "Super Lawyer" since 2006. Mr. Blood is also the Legislative Column Editor for *Trial Bar News*.

Mr. Blood is admitted to practice in the state of California, as well as the United States Courts of Appeal for the Fifth, Sixth, Eight, Ninth and Eleventh Circuits, and the United States District Courts for the Southern, Central, Northern and Eastern Districts of California, the Eastern District of Arkansas and the Eastern District of Michigan. Before starting Blood Hurst & O'Reardon, Mr. Blood was a partner in Milberg Weiss Bershad Hynes & Lerach, LLP and Coughlin Stoia Geller Rudman & Robbins, LLP. Mr. Blood received his Juris Doctor from George Washington University in 1990 and his Bachelor of Arts with honors in Economics from Hobart College in 1987.

### Leslie E. Hurst

Ms. Hurst is a co-founding partner of Blood Hurst & O'Reardon. Her practice has focused on complex class action lawsuits, including federal multi-district litigation and California Judicial Council Coordinated Proceedings, with an emphasis on consumer fraud and insurance cases under California's consumer protection statutes.

Prior to co-founding the firm, Ms. Hurst was a partner at Coughlin Stoia Geller Rudman & Robbins LLP and an associate at Milberg Weiss Bershad Hynes & Lerach LLP. While practicing at those law firms, Ms. Hurst worked in a number of practice areas, including areas focusing on cases against: (1) life insurers for misrepresenting the terms of vanishing premium life insurance; (2) auto insurers for repairs with non-OEM parts, diminished value claims and improper collection of installment service charges; (3) financial institutions for violations of the federal Real Estate Practices Act and collection of excessive closing costs; (4) insurance companies for race-based discrimination in the sale of small value "industrial" or "burial" insurance policies; and (5) consumer goods manufacturers for false and deceptive advertising.

Between 2003 and 2005, Ms. Hurst took a sabbatical from law and moved to Sri Lanka where she worked for CARE International as Coordinator for Strategic Planning with an emphasis on development of CARE's long-term strategic plan for the conflict-affected areas.

Ms. Hurst is admitted to practice in the state of California, as well as the United States District Courts for the Southern, Central and Northern Districts of California. Ms. Hurst received her Juris Doctor degree from the University of California, Hastings College of the Law in 1995. She earned her Master of Arts degree in Sociology from the University of California, Berkeley and a Bachelor of Arts degree in Sociology (*cum laude*) from the University of San Diego. Ms. Hurst is an active member of the Lawyers Club, Consumer Attorneys of San Diego, and Consumer Attorneys of California.

## Thomas J. O'Reardon II

Mr. O'Reardon is a co-founding partner with the firm. His practice has focused exclusively on complex class action lawsuits involving consumer fraud, insurance fraud, antitrust and securities fraud litigation. Mr. O'Reardon earned his Bachelor of Arts degree in Politics from Wake Forest University and his Juris Doctor degree from the University of San Diego. He is licensed to practice law in all California state courts, as well as the United States District Courts for the Southern, Central, Eastern and Northern Districts of California, and the United States District Court for the Eastern District of Arkansas.

Prior to co-founding the firm, Mr. O'Reardon worked at Coughlin Stoia Geller Rudman & Robbins LLP. There, Mr. O'Reardon worked on numerous complex class action litigation matters, including actions involving: annuity policies marketed and sold to senior citizens; insurer kickbacks known as "contingent commissions" in the property and casualty insurance brokerage industry; Sherman Act claims against the world's largest manufacturers of random access memory for computers; invasions of credit card holder's rights of privacy; false and deceptive advertising of consumer goods and wireless telephone services; automobile insurers' unlawful practices with respect to installment pay plans; and dangerous and defective products, including recalled children's toys. He was also part of the team representing the California Department of Insurance against five of the largest employee benefit insurance companies for violations relating to their failure to disclose payments of contingent commissions to brokers. As a result of the action, all five defendants agreed to sweeping changes in their disclosure practices.

Some of the actions on which Mr. O'Reardon has worked include: *In re Dynamic Random Access Memory Antitrust Litigation* (settled for more than $300 million); *In re Mattel, Inc. Toy Lead Paint Prods. Liab. Litigation* (nationwide settlement valued at over $50 million); *Gemelas v. The Dannon Co., Inc.* (nationwide settlement in excess of $45 million involving false advertising of Dannon's Activia and DanActive yogurt products); *Smith v. Wm. Wrigley Jr. Co.* (nationwide settlement in excess of $7 million involving false advertising of Wrigley Eclipse chewing gum and mints); *In re Enron Corp. Sec. Litigation* (settlements of $7.3 billion); *AOL Time Warner Cases* (settlements of approximately $630 million); *Morris v. CBS Broadcasting, Inc.* (nationwide settlement on behalf of purchasers of asbestos-laden children's toys); *In re Aqua Dots Prods. Liab. Litigation* (multidistrict litigation on behalf of purchasers of more than 4 million toxic children's toys); and *Berry v. Mega Brands, Inc.* (litigation on behalf of purchasers of more than 10 million lethal children's toys).

Mr. O'Reardon is an active member of the Consumer Attorneys of San Diego, the Consumer Attorneys of California, and a founding member of the CAOC Young Lawyers Division. He is also a member of The Sedona Conference Working Group on Electronic Document Retention and Production.